All right, our next case is 24-1043 MSP Recovery Claims, Series LLC v. Lundbeck LLC. Mr. Simpkins. Good morning, Your Honors. May it please the Court. My name is Samuel Simpkins, and I represent Appellants MSP in this matter. Your Honors, the heart of this case is a fraudulent perpetrated by Lundbeck, CVC, and Theracom to defraud the plaintiffs' assigners and the class members of hundreds of millions of dollars by funneling money through a sham copayment assistance program. Appellants argue that the District Court erred in four ways. First, by dismissing the federal RICO claims based on a flawed application of proximate cause that was on clear factual errors. Second, by incorrectly applying the judicially created bright line test known as the indirect purchaser rule, which was derived from antitrust precedent. Third, by dismissing the state law claims based on the same faulty proximate cause standard and failing to engage with the unique proximate cause standard that each state law claim requires. And the District Court's central error was its conclusion that plaintiffs did not and cannot plead proximate causation. In doing so, the District Court initially relied heavily on the 11th Circuit's iron worker's decision, which is inapplicable here for a host of reasons. However, in denying Appellants Rule 59 motion, the District Court relied more on this Court's in Albert's v. Global Tel Link and the Supreme Court's holding in Anza v. Ideal Steel. Nevertheless, the lower court's proximate cause holding rests on factual errors and unsupported inferences. And what? Unsupported inferences, my apologies. Unsupported inferences? Correct. Mm-hmm. What about the Slay case? Slay's restoration, your honor? Yes. This, uh, appellant's position is completely consistent with Slay's restoration. This court held that plaintiffs there lacked proximate cause because they were, in fact, twice removed from the alleged violation. In that case, it involved a subcontractor who was allegedly harmed when the general contractor could not fully pay the claim because the general contractor was harmed when the property owner did not receive its full payment from the insurance program, from the insurance. In that case, that case really points that proximate cause is about directness, not foreseeability. Correct, your honor. That is, that is one of the central holdings there. And while appellants do believe that that decision skipped over an important holding in the bridge decision, appellants also argue that they are directly injured here. The assigners are... That is the question here. I mean, it may have been foreseeable that it would have this increased harm, but the question is, uh, what, what, where's the direct harm that is alleged here? Yes, the direct harm was when Theracombe and the other specialty pharmacies demanded payment based on false certification that those claims complied with federal law, including the anti-kickback statute. There were clear violations of the anti-kickback statute, and if I'm remembering, defendants do not contest that. Demanded payment from who? From plaintiff's assigners, which provide their Medicare Part D sponsors, which administer the Part D. So not from appellants themselves? Correct. Appellants stand in the assigner's shoes pursuant to assignments directly entered into with each of the, uh, assigners. So, um, at times I may slip between saying appellants as signers because appellants are sitting in the shoes, and that was actually a finding that the district court made that, um, that appellants did have standing to pursue these claims. But the question is, to whom is the false certification made? It was... The other side said it's to the government. That's not true, your honor. The false certification was made directly to the assigners when Theracombe and the other specialty pharmacies submitted a claim for payment to the assigners. So there, there is no causal event or intervening third party between the specialty pharmacy and the assigner who pays the claim. So when the government, uh, alleged the violation of the, uh, anti-kickback statute and settled the claim, that wasn't for harm caused to the government? So there's, there's two things I'd like to say about that, your honor. Uh, first, under the False Claims Act and the anti-kickback statute, the government does not need to allege that it was in fact injured to have standing to pursue those claims. There are, uh, monetary statutory violations for even attempting to, uh, violate the anti-kickback statute. Secondly, the, as the settlement agreement between the DOJ and Lundbeck made clear, the government was pursuing, uh, claims, uh, related to not just Medicare, but also Medicaid and the VA health insurance program, which in those latter two, the government may have direct privity, if you will, between, uh, uh, the defendants and the claims that were paid. So it's, it's, uh, factually incorrect to say that the government sits between the specialty pharmacy and the assigners. And the complaint has made that clear and it's been briefed several times. And it's a theory that defendants have continued to present an advance that, in fact, the certifications were made to the government. There were a set of certifications. Haven't you lost several times in cases around the country on the arguments you're making? We have lost several times and we've won once. Once. Yeah. Yeah. What do you think is your best authority for your position? The best authority for the position is this court's decision in Albert v. Global Telelink, which I understand Chief Judge and Judge Thacker were on the panel that wrote that opinion. Um, Albert tells us, or my understanding of Albert tells us, sorry if I'm preaching to the choir here, that RICO proximate cause hinges on two factors. The first was, uh, whether there's a more direct victim of the scheme. And second, whether the alleged injury is too distant or logically unrelated to the predicate acts. Plaintiffs satisfy both factors here. To date, defendants have failed to identify any other more direct victim. And further, the entire purpose of the scheme, as alleged, was to defraud the assigners into paying for tainted claims. Can I ask, so the government has gotten a little bit more skeptical about these independently run assistance programs that help pay co-pays and the like for folks who can't afford them, and perhaps rightly so. But under your theory, wouldn't, I mean, but they still exist, and they've been presumably blessed or at least not sanctioned by the government. Um, under your theory, is there any government assistance program that would not be subject to a RICO claim? Absolutely, Your Honor. There are, um, without having the benefit of seeing the internal operations of each of these, I'm willing to assume that there are a host of co-payment assistance programs that do follow the law, and they do follow the rules. And the OIG has even issued guidelines that say, if you're going to run a co-payment assistance program, here's how you can be compliant with the anti-kickback statute. CVC in this case certified twice, and this is where there were certifications made directly to the government, certifications to the OIG that it was and would continue to follow those guidelines. Plaintiffs allege that that was a blatant falsehood, that Lundbeck was essentially controlling CVC's operation and administration of the Huntington Disease Fund. Lundbeck's money was essentially funneled through this charity to wash it, to appear, so that it would have the propriety of a legitimate assistance. It may be helpful to the role of a co-payment charity by analogizing it to getting family help. There's nothing that violates the anti-kickback statute or federal law when a family member helps you afford your medication. However, if that family member got that assistance from the drug manufacturer, the law is very clear that that is an illegal kickback. It cannot be delivered. And there were supposed to be checks and balances in place. Well, but, I mean, you just mentioned kickback. That's the whole purpose of the anti-kickback statute and the reason why the government pursued its civil claims. So, having done that, what's left to adjudicate here? I appreciate the question, Your Honor, because the other important thing that Albert's told us is that a single scheme can create two sets of direct victims. And I think that that's an appropriate analogy to this case. As I mentioned, the government may have been directly injured through its administration of VA health insurance, federal employee health insurance, Medicaid, and even in the rare instance where prescription drugs are administered in a hospital, that would fall under Medicare Part B. That would be one slice of the pie, if you will. The second set of victims, the second slice, are the entities that actually deliver Medicare Part D health insurance. And their rights have not been vindicated. The government stood and recovered where it was harmed, and again, even without having to show actual damage, the entities that actually administer Part D have not. Is that why you think our Albert opinion helps you? You think there are two logically independent injuries here? Correct, Your Honor. Yeah, that is, I think, one of the other helpful things is that it's... But there aren't two logically independent injuries here, are there? Appellants argue that there absolutely are, Your Honor. Doesn't it all arise from the same conduct? It arises from the same scheme. The specific predicate violations, as plaintiffs allege, are at the final stage submitting a claim for payment. These claims for payment carry implied certifications of compliance with federal law, including the anti-kickback statute. Those claims for payment were submitted to two sets of parties. First set is what appellants are representing here today, Medicare Part D sponsors and the class members. The second set would be the hypothetical that claims were submitted directly to the government. Now, again, we don't have the government's data on this, and I can't say for certain that claims for payment were submitted directly to the government, but that is how it would create those two sets. Those would be discrete predicate acts flowing from the same scheme. But in Albert, one of the concerns was these families of the inmates who were being forced to pay, you know, overpriced charges for telephone services because of the scheme. There's no allegation here that anyone was forced to pay something other than what the market price was for the drug at the time, or is there? Well, Your Honor, there is. Appellants have advanced three theories of injury. We've spent most of the time talking about the third, which is that they were induced into paying claims that they were legally obligated to not pay. And so they were deceived, they were tricked, they were lied to directly by Theracom and told that these... That's a boilerplate assertion. I think what Judge Diaz is going is Rule 9B requires some specificity to it. The question is, where do you plead with any degree of specificity that the defendants knew that these certifications were false? Yeah, Your Honor, I have three things I'd like to say about that. First, there are two theories of predicate acts. First is mail and wire fraud. Appellants can see 9B controls there. The second is the Travel Act, and the few courts that have addressed the issue have held that Rule 9B does not apply there, and it's controlled by Rule 8. Second thing I'd like to say is that even under Rule 9B, a defendant's state of mind can be pledged generally and is not subject to the particularity of who, what, when, where. Third, in plaintiff's motion to supplement the complaint, which was granted by the district court and is incorporated in the joint appendix at page 218, plaintiffs were able to identify and confirm a set of claims in which two important things were confirmed. One, that these patients received copayment assistance directly from CVC, and two, that claims that were paid by the assigners came directly from Theracom, and that payment was made directly to Theracom. And so we would argue that that more than meets 9B. It identifies the patients, the dates, the drugs, who was paid and who was paying. The requirements of 9B and RICO do not even require that each defendant engaged in the predicate acts and actually use the mail-in wires or receive. Any insight to a case that goes to where you're going with that, that this boilerplate type certification is sufficient to satisfy Rule 9B? I can, your honor. There was a case out of the Central District of California in which there's the same plaintiffs against the manufacturer Amgen. The court analyzed allegations substantially similar to this case and found that plaintiffs were able to identify the who, right? They identified the defendants. They identified the class of communications. This is both money sent by manufacturer to copayment charity, communications sent by the charity to the manufacturer, money sent from the charity to specialty pharmacy, claims for payment sent by the pharmacy to the assigner, and were able to identify specific instances of that as plaintiffs have done here. Specific instances of these mailings that are demonstrative of the scheme generally. While my time is waning, I would like to quickly touch on the second error of the court, which was applying the indirect purchaser rule. Proximate cause takes many forms, but it always answers the who can sue question. Defendants would argue that separate from satisfying the direct injury test as laid out in Albert's, relying on the Holmes decision, that appellants would need to also satisfy a separate indirect purchaser standard. This is inconsistent with case law. The Supreme Court most recently in Apple v. Pepper said that the IPR, like the direct injury test, is an implementation of proximate cause, not some separate statutory standing test that must also be met. Both the majority and the dissent agreed on this point. Justice Gorsuch wrote there, quote, this court has long understood Illinois BRIC as simply applying these traditional proximate cause principles in the antitrust context. So we would argue that given the Supreme Court's repeated rejection of bright line rules to RICO found in Holmes and Bridge and Zedema, that applying this rigid rule to RICO is both unfounded, inconsistent with the congressional intention, and conflicts with binding Supreme Court precedent. All right. Thank you, Mr. Simpkins. You've got some time left for rebuttal. Mr. Glick. Good morning. May it please the court. My name is Coley Glick. I represent Lundbeck LLC. I'll be addressing the bulk of Appelli's arguments. My colleague, Mr. Cardozo, will take the last three minutes to address any THERACOM-specific questions this court may have. This court should affirm, and nothing you just heard from my friend should disturb the district court's sound conclusions that MSP failed to allege proximate causation, that the indirect purchaser rule bars its claims, and that the state law claims are meritless. I'd like to start by just situating this case in the broader landscape of MSP's copay charity litigation campaign. There are more than 10 materially identical complaints that MSP has filed around the country. By my count, as of this morning, there were 11 separate memorandum opinions from district courts rejecting MSP's materially identical claims. He says they've won one. Is there one that they've prevailed? There is one. That's the Amgem case out of the Central District of California. It's an outlier. I'll say three things about it. One, it does not engage with any of this other precedent. It doesn't engage with the 11 other opinions dismissing these claims. It doesn't even cite them. Second, if you look at the Jazz Court out of the Northern District of California, Judge Davila looks at the Amgem case and also looks at an Actelion case, two MSP cases, and says, you know, Actelion is more persuasive. I'm rejecting Amgem. So the courts that have looked at Amgem have found it unpersuasive. And then, I guess, the final point is just that we, you know, we don't, well, there is an interlocutory appeal pending in that case. And so there's also a Rule 11 motion for sanctions pending in that case. I was going to ask about the, at some point, this all becomes frivolous and potentially sanctionable. There are two. Are there sanctions? There are two Rule 11 motions pending right now. One in that case in Amgem, one in the Northern District of California case, and Actelion. Respectfully, we believe these do border on frivolous claims. And what this wave of precedent shows is that there just is no cause of action here. MSP is trying to manufacture a cause of action out of these DOJ settlements where none exists. So if I may, I'll plan to start with the RICO causation, proximate causation, and it does help to parse through these three theories. We have the inflated prices, inflated volumes, and then the tainted claims theory, which wasn't in the complaint, but they added through briefing. And so inflated prices really puts us squarely in slaves' territory, to Judge Wynn's question. When we're talking about directness, we're looking at, quote, sequentially the direct result, usually at the first step, is what this Court and the Supreme Court in Holmes has said. And tellingly, the first step is not in the complaint. Lundbeck set the price of Xenazine. Lundbeck manufactured Xenazine. Who purchased Xenazine from Lundbeck? That is not in the complaint. We don't even know what the first step is. Now, MSP acknowledges, this is paragraph 116JA56, they acknowledge that there's this complex chain of distribution in the pharmaceutical industry. Wholesalers, pharmacy benefit managers, pharmacies, they're all passing the medication along in the ordinary course of this distribution chain. MSP doesn't mention any of those. That injury would be passed along. If there was an inflated price at the beginning, it would have been passed along through that distribution chain, putting this case squarely within the ambit of slaves. It's not within the scope of Albert. I mean, Albert, the plaintiffs, were the prisoners and their families who were paying more money for the inflated prices of these prison telephone calls. So that's a direct injury. That's the first step, sequentially the first step. And the fact that there's a separate injury to the government was irrelevant. Inflated volumes. Here again, important to know what MSP does not allege. Does not allege that this drug was unsafe or ineffective. Doesn't allege any misleading communication to physicians. What it alleges is that these patients were very sick, your honors. I think it's important to note. Huntington's disease, serious disease, these patients need that copay assistance to be able to afford their medication, and they got their medication. And so when we're talking about inflated volumes, there's just no undue influence on these doctors. Well, but apparently the government thought there was something amiss here when it alleged that there were violations of the anti-kickback statute and so I get it. I think everybody wants to have patients being able to afford their medications, but it has to be done within the contours of the law. That may not answer who gets to sue. I guess the question is the government has been vindicated. Why are they, why is your colleague on the other side interested? But there could be more than one person harmed, right? In theory. At a broad level, in theory, more than one person could be harmed. But when we're talking about anti-kickback, which is really the heart of this, there's no private cause of action. It's not a RICO predicate. That is the government's prerogative to enforce the anti-kickback statute as it sees fit. And, you know, there was no admission of fault in the settlement either, so it's not like we have an admission of anti-kickback violation either. But then we get into this, again, the causal chain. I mean, how do they link an anti-kickback statute violation to their alleged injury? And really what they're saying is that copay charities increase the price of medications. And, you know, folks have been having that debate since 2013 in the BMS case that we just cited in our briefs where the court said that this is a policy dispute over the price of medications. And certainly RICO is not going to solve the, you know, the healthcare system of the damages actions. Let me move to tainted claims. Well, yeah, that's a good point. I mean, they allege that, but I don't know that they ever explain how that happens or who's to blame. Exactly, Your Honor. And, I mean, that's really, they cannot distinguish the alleged harm, whatever wrongful conduct here, which under the government's theory was the communications between Lundbeck and CVC. That was the alleged harm. They can't link that to their inflated prices, inflated volumes. It's just this totally separate sort of regulatory violation. I mean, it was an industry-wide investigation. DOJ said we're going to change some of the rules around this. And that's really what we're dealing with here. And then private plaintiffs coming along and trying to make something out of that DOJ settlement, which is really a purely anti-kickback statute enforcement issue that's unique to the United States government. So if the manufacturers, the allegation is that driving up demand, or at least by funneling these donations, these PAPs here, the result does have some level of an injury, don't you think, to the downstream insurers who are picking up the bulk of those inflated prices? Well, no, Your Honor, not on this complaint. I mean, we have no idea what happens in the chain of causation, right? When we're looking at slays and how to link that chain of causation, we don't know who's at the first step. We don't know who's at the second step. We don't know anything about what happens. You would never be able to recover on a RICO because there are too many steps in the chain. Is that right? I don't know that's right. There could be a different plaintiff who has a cause of action. These plaintiffs certainly have not alleged one. Who are the direct purchases here? It's not alleged in the complaint, Your Honor. We know that Lundbeck set the price. Who would be direct purchases? So in the ordinary course, it would probably be a wholesaler would be the next step. And again, there's sort of a... A direct purchaser could recover because that's not an indirect, that's a direct one. Why would they? Don't they benefit from it? Increase quantity? If they have to pay the inflated price, Lundbeck is alleged to have inflated the price. So Lundbeck set a higher price. I understand, but the wholesalers, you would think they'd be all right with an increased demand passing through. Why would they ever bring an action as a direct purchaser? Your Honor, it's not alleged in the complaint. I can't answer that. I'm trying to understand. Why would they? I mean, if the indirect can't do it, why would a direct ever do it? So you can't recover. I mean, because you're not going to get... If we block this with, as you say, judicial rule or whatever, indirect purchaser, in this instance, who's going to maintain an action? I mean, the direct purchaser, I think it looks like to me they benefit. Don't you think they benefit from increased demand the wholesale? It would depend on their cost structure. It would depend on a lot of things that are... We're way outside the record now. So let's stick with proximate causation. Let me give Your Honor an example of where courts have found proximate causation, the Painter's case out of the Ninth Circuit, which MSP relies on. And Painter's is part of a circuit split. We submit it's at the outer edge of proximate causation. But even accepting Painter's as a law, there were direct misrepresentations to the doctors there. There was misrepresentations about the risks of the drug causing bladder cancer. And so there the Ninth Circuit said, well, that's a direct effect. There we can trace the injury directly to the doctors who prescribe more of the medication as a result of these misrepresentations. There's nothing like that here. We don't have a misrepresentation to doctors. Nothing like that is alleged. Again, this is undisputedly a safe and effective drug that was necessary to treat a serious illness. One more point about the tainted claims. And I think, Judge Diaz, this goes back to your question about the anti-kickback statute. Under this tainted claims theory, there's actually no injury at all. I mean, MSP's assigners, these insurance companies, were paid by the government. They have contracts with the government to provide these services. And so they were paid. Sometimes they get premiums from patients. That's alleged in the complaint as well. So they were paid. They provided these services. Patients got the services that they contracted for. And then now I think they're asking for a refund. I think maybe even treble damages on the refund of the services that they provided and were obligated by contract to provide. So it's just seeking a pure windfall. MR. DIAZ I don't confess to know all the intricacies of the Medicare program, although I may need to figure it out soon since I'm getting to that age. But so do they provide these drugs under a fixed price contract? In which case, if they end up having to pay more to get the drugs, they might be, they might suffer a loss. MR. GOLDSMITH So as alleged in the complaint, there's bids submitted every year. So these health insurance companies calculate it with their actuaries. They submit bids to the government. Government accepts those bids. And then it's on a per patient basis. So they predict how much the medications are going to cost. They predict how much, you know, the patients are going to need. And I think the case is helpful in sort of exploring this issue. And there is some assumption of risk that the insurer takes on as they insure people. Right? That's the business of insurance. So they assume the risk of some fluctuation. MR. DIAZ Right. But they do that assuming there's going to be a level playing field and everybody's playing by the rules. But if there's something that affects that risk, aren't they harmed? MR. GOLDSMITH I don't think there is anything that affects that risk here. Again, you know, the mere existence of copay charities is known and accepted in the industry. It may be contentious as a policy matter on certain levels, but it is not something that's unlawful on its own. So when they say that charities increase the price of medication, that is not a cause of action. Let me move to the indirect purchaser rule briefly. Well, sorry, one more thing about the tainted claims theory. It would be a per se rule. It would be because there's a tainted claim at some unidentified point in time, or an AKS violation, some identified point in time, every claim is per se unlawful and unpayable. I think that's their theory. And I'm sure my friend will correct me if I'm wrong, but every single claim, it's not really trying to connect the links to the chain of causation anymore at all. It's trying to read causation out of the statute. And that's inconsistent with SLAES. It's inconsistent with HOMES. The indirect purchaser rule is an independent bar to the RICO claims. And here, the recent case law is really centered on the indirect purchaser rule as a bar to these specific claims from MSP. We submitted a couple of supplemental authorities. I think the Celgene case, it's a long decision, but it really deals with the indirect purchaser rule in depth and addresses all these arguments really closely, commend it to the court's attention, but also- But is it plotted in the context of a RICO claim? Yes, Your Honor. So there are antitrust issues in Celgene, but this materially identical co-pay RICO conspiracy was alleged in Celgene, and the court rejected it under the IPR. So too in Biogen out of the District of Massachusetts. So too in Pfizer, Judge Friedrich on the District of Columbia. So we have these courts around the country adopting this rationale and really circling in on the indirect purchaser rule as a bar. And there's some policy arguments against it to be sure. My friends raised some. The courts have flagged some. But at the end of the day, it's a question of statutory interpretation. But the rationale for the IPR, is that the most, the direct, the harm to the one that's been directed, the right party has incented to sue here. Who here has more harm here than the astronauts? Well, so we would dispute that there is harm, of course, first of all. Second of all- Let's assume that you have this inflated prescription and prices. Who would be more harmed than the astronauts? So I think when we're talking about- I don't have a direct answer. It's not alleged in the complaint. Who would be more harmed? It's possible the pharmacies, it's possible the wholesalers. I understand there's some hypotheticals about maybe they're making more money with more volume. We don't have any of that. You're addressing how this particular indirect purchaser, the specific facts, but we're dealing with a legal issue here. Does that apply in the context of a healthcare context as opposed to a different context? Right. And so- And so to make it sincere, I mean, it either harms them or not. If it doesn't harm them, you're dealing with an IPR. Does it make any sense in the healthcare context, is my question, where the alleged wrongdoing doesn't affect the direct purchaser, it seems like, to me at all? So first answer is that the courts have held that it does apply squarely in the healthcare purchaser context and, in fact, in the context of these precise cases. So we have the Biogen case from the District of Massachusetts, the Humana versus Invidior case, which the district court relied on here. That's from the Third Circuit. And then we have the Pfizer case from the District of Columbia. So all these courts have addressed this exact question. Their reasoning is persuasive. A bigger picture point, though, is that the indirect purchaser rule exists to create a bright line rule to prevent abuses in RICO. And so when the Supreme Court created it in Illinois brick, it was interpreting the language of the Clayton Act. And the language of RICO is materially identical. It's by reason of a violation. And so there's no reason, no statutory reason, to treat the IPR differently in the RICO context. In fact, it makes a lot of sense here where MSP is alleging, quote, supra-competitive prices. I mean, that sounds a lot like an antitrust claim. That sounds a lot like a Clayton Act claim, which is exactly where the indirect purchaser rule arose from. And it's really sort of an antitrust case disguised as a RICO case here when we're talking about inflated prices. So part of the answer is it's not one clear party who would be injured, Judge Winn. It would be this whole chain of pass-on injuries that the court would need to parse through and that the parties would need to parse through. And that's why we have an indirect purchaser rule to create this bright line rule that says, no, if you're not direct, you don't get to sue. And we're not going to worry about who might be the right person to sue in this causal chain because you just need to sue whoever directly purchased the medication is the one entitled to sue. We don't reach this if you agree with your own approximate cause, I take it. Yes, Your Honor, I think that's right. They're independent bases to affirm. Thank you, Mr. Glick. Mr. Cardozo. Good morning, Your Honor. Ray Cardozo representing Apelli Theracom. Requested three minutes just to see if the court had any questions about the Theracom specific piece. We've jointly briefed it. Don't think the issues are distinct. Well, let me just make this observation. This might be the shortest argument on record. I'll make one observation on Judge Wynn. You're going to have a record. You don't need to. The answer to your question to Mr. Glick was where you started with your question to my learned friend on the other side. The RICO test for approximate cause is directness, not foreseeability. And all 11 of those memorandum decisions, Mr. Glick pointed out, pointed to talk about how the independent prescribing decision of the physicians is in this mix. And that's exactly the sort of thing that breaks the chain of RICO causation because it's not direct. The Southern District of Florida case that the district court relied on that involved the same copay charity pointed out those physicians' independent prescribing decisions break the chain of causation between these pharmacies' alleged contributions to CVC. Who would be the direct purchaser? Well, the direct purchaser is the wholesaler but may not be injured. My question goes to you. Why would they ever sue? I mean, you wouldn't get a suit from a direct have a higher quantity. So this scheme of sending money to the PAPs that, you know, paid whatever the copay and it allows the demand for the property to increase, you've got this intermediary that the manufacturer uses and it insulates them because they won't ever sue, will they? Right. But you also have another intermediary, the physician who doesn't benefit at all and doesn't need to consider. See, that's just the You're saying a physician is a direct purchaser too? No, but the physician, this court's decision in Albert talks about not only who's the direct victim but if there are other intervening factors. You have to have no other intervening factors to break RICO causation. So, and you also have the pleading problem that the wholesalers may or may not and that isn't pleaded. Why isn't that, why aren't the, why is not the direct purchaser the consumer? I mean, it's a bit of a facade because the consumer doesn't pay, insurance company covers the bulk of the payment and any copays, but isn't the consumer the direct purchaser of these drugs? Could be, but the other, see, they didn't plead what the pharmacy, what the pharmacy manager puts them on the formularies that, they didn't plead how all of the many, many steps in the chain that can influence whether the consumer, the patient gets the drug, what their role is, whether they benefit how or whether they're harmed. So we've got a pleading problem, but even if you speculated all the way out to treat the patient as the direct purchaser, you still have the problem that you have an independent intervening factor, a physician who doesn't need to take any of these things that they're concerned about into account. And that's why they missed the point of the iron workers case that the district court cited. That case focused on, if you're showing a misrepresentation about safety and efficacy, then you've got a direct link to the prescribing decision, which is the key intervening factor. If you don't have that, and you don't have that here, you've got an economic issue and you haven't severed, then you're just speculating in a way that RICO proximate cause does not permit. All right. Thank you, sir. Mr. Simpkins. Thank you, your honors. There's a number of issues I'd like to address, so pardon if I come across as talking fast. First, MSP is not alone in this space. Other major party sponsors are pursuing this exact issue. Humana was mentioned by a brother council, United Healthcare. The Biogen decision that was referenced was actually just heard by the First Circuit on oral arguments asking the same exact question about whether the indirect purchaser rule applies to RICO. Plaintiffs there, or Humana, were joined by an amici, which involved the foremost experts on RICO in the country. And they said that the IPR is a proximate cause test, has no place in RICO, and should stay strictly to the antitrust context. Secondly, brother council indicated that there's a pleading deficiency about who the direct purchaser will be. I'd like to make a few notes on that specifically. Xenazine is a drug that is governed by an FDA REMS program, which means its distribution chain is highly regulated. It is not uncommon for a REMS drug to go directly from a manufacturer to a specialty pharmacy. Plaintiffs don't know whether there's a wholesaler in the market. Lundbeck and the other defendants have had the opportunity, twice now, to present affidavits or other kinds of evidence to suggest that there was. They have not done so. Secondly, to Judge Wynn's point... You couldn't plead upon information and belief, that sort of thing, and then wait for discovery to determine it? How would that work? Your Honor, I think the flaw is more inherent and fatal. As you pointed out, wholesalers not only stand to benefit by increased volume, they explicitly stand to benefit by increased prices. This was alleged in the complaint at paragraph 116. Wholesalers are paid on a percentage cost of the drugs they acquire. It's called the wholesale acquisition cost or WAC. That's how they make their money. So the more expensive the drug is, the more money they make. Secondly, on the point of wholesalers, Theracom is owned by a company called Amerisourceburg, and this is in the complaint as well. Amerisourceburg is a pharmacy wholesaler. So there may even be a scenario where there's a wholesaler that is, in fact, just another arm of defendants' operation. MAOs operate at risk. Yes, there is an agreement with the federal government that supplies a portion of their funding, and yes, in most cases, patients pay premiums. But they operate at risk, which means they stand to benefit and they stand to lose. My last point I'd like to make, the record shows that on February 28, 2013, Theracom lied directly to plaintiff's assigner, Avandia. On March 4, 2014, Theracom lied directly to Blue Cross Blue Shield of Rhode Island. On February 9, 2016, it lied directly to Connecticut on and on and on for each of its assigners. That's in the record. That's a particular allegation about a direct lie to the assigners that resulted in direct injury. Thank you. Thank you very much. My thanks to both counsel for their arguments. We'll come down and greet you and take a recess before moving on to our next cases. This honorable court will take a brief recess.
judges: Albert Diaz, James Andrew Wynn, Stephanie D. Thacker